# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| The account and information associated with debbiekrising@gmail.com that is in the possession of Google LLC, whose office is located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, more fully described in Attachment A, attached hereto. | ) |

Case No. 20-sw-01389-STV

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___Northern___ District of ___California and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

      X  evidence of a crime;

      X  contraband, fruits of crime, or other items illegally possessed;

      X  property designed for use, intended for use, or used in committing a crime;

      ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation 21 U.S.C. §§ 331(a), 333(a), 841(a)(1) and (c) and 18 U.S.C. §§ 1341, 1343, and the application is based on these facts:

      X  Continued on the attached affidavit, which is incorporated by reference.

      ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s Christopher Gann*
_____
*Applicant's signature*

Christopher Gann   Special Agent FDA-OCI
_____
*Printed Name and Title*

Sworn to before me and: ☐ signed in my presence.

                  ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __November 2, 2020__

_____
*Judge's signature*

City and state: ___Denver, CO___

Scott T. Varholak, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, Christopher Gann, Special Agent with the Food and Drug Administration- Office of Criminal Investigations (FDA-OCI) being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      I am currently employed as a Special Agent with the Food and Drug Administration-Office of Criminal Investigations (FDA-OCI). I have been a Special Agent with FDA-OCI since March of 2014. Prior to my current assignment, I was a Special Agent with Homeland Security Investigations for 13 years. I have successfully completed the Criminal Investigator Training Program and the FDA's Special Agent Training Program at the Federal Law Enforcement Training Center. In addition, I am a licensed Certified Fraud Examiner through the Association of Certified Fraud Examiners. During my 19-year career as a federal investigator, I have conducted a wide range of criminal investigations involving misbranding and adulterated drugs, mail fraud, wire fraud, narcotics smuggling, and money laundering. As a Special Agent with FDA-OCI, I am responsible, among other duties, for conducting criminal investigations involving violations of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21 U.S.C. 301-399, and other applicable violations of Title 18 of the United States Code.

2.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, LLC (hereafter "Google,", "Provider") to disclose to the government records and other information, described in **ATTACHMENTS A and B** incorporated by reference, that constitute evidence, fruits and instrumentalities of violations of federal laws relating to fraud and the FDCA, including violations of misbranding (18 U.S.C §§ 331(c)(d)), mail fraud, (18 U.S.C. §§ 1341), wire fraud (18 U.S.C. § 1343) and distributing controlled substances (21 U.S.C. § 841 (a)(1) and (c)), (hereinafter the "SUBJECT OFFENSES,") including the contents of communications, associated with the email accounts debbiekrising@gmail.com (hereinafter the "SUBJECT ACCOUNT" described in **ATTACHMENTS A and B** that are stored at premises owned, maintained, controlled, or operated by: Google, a company located at located at 1600 Amphitheatre Parkway, Mountain View, CA 9404.

3.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES are located in the places described in **ATTACHMENTS A** and **B**.  Witnesses and victims, whose true identities are known to me, are identified in this affidavit by reference to their respective titles and roles.

4.      The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; my training and experience; knowledge obtained from other individuals including law enforcement officers/personnel; and my review of reports and other

evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

## BACKGROUND:  THE REGULATION OF DRUGS BY THE FDA AND RELATED CRIMINAL STATUTES

### I.     General Definitions

5.     Under the FDCA, "interstate commerce" means commerce between any State or Territory and any place outside thereof, and commerce within the District of Columbia or within any other Territory not organized with a legislative body.  21 U.S.C. § 321(b).

6.     Under the FDCA, "label" means a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).  The term "labeling" is defined as all labels and other printed or graphic matter upon any article or any of its containers or wrappers or accompanying such article.  21 U.S.C. § 321(m).

### A.  The Definition of "Drug" in the FDCA

7.     Under the FDCA, "drugs"  are defined as, among other things: (a) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (b) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (c) articles intended for use as a component of any articles specified in (a) or (b) above.  21 U.S.C. § 321(g) (l)(b)-(d).

8.     A product's intended use is not determined by the intrinsic properties of the product, but by the seller's objective intent in promoting, distributing, and selling the product. S*ee United States v. An Article . . . "Sudden Change"*, 409 F.2d 734, 739 (2d Cir. 1969); *see also* 21 C.F.R. § 201.128. The objective intent is determined, inter alia, by such persons' expressions, labeling claims, advertising matter, or oral or written statements by such persons or their representatives. *See Hanson v. United States*, 417 F. Supp. 30, 35 (D. Minn. 1976), *aff'd*, 540 F.2d 947 (8th Cir. 1976); *see also United States v. Storage Spaces Designated Nos. "8"1 and "49"*, 777 F.2d 1363, 1366 (9th Cir. 1985) ("intent may be derived or inferred from labeling, promotional material, advertising, or any other relevant source.").  Indeed, even water can be a drug if it is claimed to have curative properties. *See United States v. 353 Cases . . . Mountain Valley Mineral Water*, 247 F.2d 473 (8th Cir. 1957).

9.     A "new drug" is any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. 21 U.S.C. § 321(p)(1). In order to be lawfully marketed, sold or dispensed in the U.S., a new drug must be the subject of a New Drug Application ("NDA") or Abbreviated New Drug Application (ANDA), or be exempt pursuant to an approved Investigational New Drug Application (INDA). 21 U.S.C. § 355. The FDCA makes it a crime to introduce or deliver for introduction an unapproved new drug into interstate commerce. 21 U.S.C. § 331(d).

10.     A "prescription drug" under the FDCA is a drug that: (i) because of its toxicity and other potential for harmful effects, or the method of its use, or the collateral measures necessary to its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or (ii) was limited by an application approved by FDA, to use under the professional supervision of a practitioner licensed by law to administer the drugs.  21 U.S.C. § 353(b)(l).

### B.  "Misbranded Drugs" under the FDCA

11.     Dispensing a prescription drug without a valid prescription by a licensed practitioner is deemed by statute to be an act with causes the drug to be misbranded while held for sale.  21 U.S.C. § 353(b).

12.     A drug can be misbranded under the FDCA in many different ways, including but not limited to:

a.     If its labeling is false or misleading in any particular, 21 U.S.C. § 352(a);

b.     If its labeling does not bear adequate directions for use, 21 U.S.C. § 352(f)(11).

c.     If its labeling did not bear the name and place of business of the manufacturer, packer, or distributor, including the street address, city and zip code, 21 U.S.C. § 352(b), 21 C.F.R. § 201.1(i); or

d.     If it was manufactured, prepared, propagated, compounded, or processed in any establishment in any State not duly registered with the Secretary of Health and Human Services pursuant to 21 U.S.C. § 360, 21 U.S.C. § 352(o).

13.     "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it was intended without a doctor's supervision. 21 C.F.R. § 201.5.  Directions under which a *layperson* can use a drug safely cannot be written for a prescription drug because such drugs can, by definition, only be used safely at the direction, and under the supervision, of a licensed practitioner.  Approved prescription drugs dispensed pursuant to a valid prescription are exempt from having adequate directions for use by a layperson.  But prescription drugs that are unapproved new drugs or dispensed without a valid prescription are necessarily misbranded for lacking adequate directions for use.

14.     A drug is adulterated if, among other things:

a.     It is prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health, 21 U.S.C. § 351(a)(2)(A), or

b.     The methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice (CGMP) to assure that the drug meets the requirements of the FDCA. 21 U.S.C. § 351(a)(2)(B). The failure to comply with any CGMP

4

regulation set forth in 21 C.F.R. Part 210 or 211 in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under 21 U.S.C. § 351(a)(2)(B). 21 C.F.R § 210.1.

15.     Manufacturing processes include packaging and labeling operations. 21 C.F.R. § 210.3(12).

16.     Minimum CGMPs for drugs require, among other things, procedures to ensure that the containers, closures, packaging material and drugs were safe, and that labeling is adequate and free from error. 21 C.F.R. § 211.80-211.94; 21 C.F.R. § 211.122-137. CGMPs also require companies to keep accurate, complete, and contemporaneous records of the packaging, labeling and distribution process to that the companies and FDA can monitor the conduct of company processes and employees throughout the packaging, labeling, and distribution process and can evaluate the integrity of the shipped products. 21 C.F.R. § 211.180-198. Moreover, the CGMP process mandates that companies have in place a quality control unit, governed by written procedures, with responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products. 21 C.F.R. § 211.22.

### C.   The Criminal Penalties of the FDCA

17.     The FDCA contains several criminal provisions.  Relevant here are the provisions of 21 U.S.C. § 331.  Section 331(a) makes it a crime to introduce or deliver for introduction into interstate commerce any misbranded or adulterated drug.  Section 331(c) makes it a crime to receive in interstate commerce any misbranded or adulterated drug, or to deliver or proffer the delivery for pay or otherwise any misbranded or adulterated drug.  Section 331(d) makes it a crime to introduce or deliver for introduction into interstate commerce any unapproved new drug.  These crimes are strict-liability misdemeanors under 21 U.S.C. § 333(a)(1).  *See United States v. Park*, 421 U.S. 658 (1975).  But they are felonies if they are committed with an "intent to defraud or mislead" either consumers or government regulators.  21 U.S.C. § 333(a)(2).

### D.   Other Crimes Associated with the Distribution of Drugs

18.     Other statutes asides from the FDCA criminalize behavior associated with the distribution of drugs.  The mail and wire fraud statutes, for example, punish schemes to defraud or the use of false and fraudulent representations, pretenses and promises to obtain things of value executed, respectively, through the mail or interstate wires.  And the Controlled Substances Act imposes criminal penalties on individuals who distribute controlled substances when not specifically authorized to do so.  Phentermine and Phendimetrazine, described in more detail below, are Schedules IV and III controlled substances.

19.     Finally, the general conspiracy statute, codified at 18 U.S.C.§ 371 generally prohibits any agreement between two or more people, consummated with one or more overt acts, to either defraud the United States, or to commit any offense against the United States, including the offenses described above.

<u>**THERE IS PROBABLE CAUSE TO BELIEVE THAT DEBBIE RISING COMMITED**</u>
<u>**AND IS COMMITTING THE SUBJECT OFFENSES**</u>

20.     In August 2020, I interviewed a cooperating witness ("CW") pursuant to a proffer agreement related to his/her activities of importing, manufacturing, and distribution of sublingual hCG to individual consumers and medical practitioners throughout the U.S.  The CW has agreed to plead guilty to felony misbranding in violation of 21 U.S.C. §§ 331 and 333 pursuant to a cooperation agreement that contemplates a possible reduction of sentence for providing substantial assistance.  The CW has a prior conviction for driving under the influence.  When it has been possible to corroborate the CW's information, the information has been consistent with other sources.  In sum and substance and in pertinent part the CW told me the following that a Georgia based company called Releana LLC is manufacturing and distributing sublingual hCG to individuals and medical practitioners throughout the U.S. on a large-scale basis.

21.     hCG or "Human Chorionic Gonadotropin" is a hormone that is produced by the human placenta during pregnancy.  FDA has approved several hCG prescription drugs for the treatment of female infertility and other medical conditions.  FDA has not, however, approved any hCG drug for weight loss. hCG can only be obtained by prescription from a licensed prescriber.

22.     hCG has gained popularity as a weight loss aid despite no substantial evidence that it is safe or effective in promoting weight loss.  In fact, the FDA-approved labeling of Pregnyl® and Novarel®, which are two FDA-approved HCG prescription drugs, contain the following upper-case warning statement:

> HCG HAS NOT BEEN DEMONSTRATED TO BE EFFECTIVE ADJUNCTIVE THERAPY IN THE TREATMENT OF OBESITY. THERE IS NO SUBSTANTIAL EVIDENCE THAT IT INCREASES WEIGHT LOSS BEYOND THAT RESULTING FROM CALORIC RESTRICTION, THAT IT CAUSES A MORE ATTRACTIVE OR "NORMAL" DISTRIBUTION OF FAT, OR THAT IT DECREASES THE HUNGER AND DISCOMFORT ASSOCIATED WITH CALORIE-RESTRICTED DIET.

23.     Releana LLC and was formed in Georgia in 2016 as a Limited Liability Company with a listed owner of MAURICE BAILEY. The company has a listed address of 169 Towne Center Parkway, Hoschton, GA 30548.

24.     Releana has a publicly-accessible website — www.myreleana.com ("My Releana") —  that advertises the sale of hCG for weight loss.  I visited the website on September 16, 2020.  The "contact" section of the website lists the same address listed for Releana LLC: 169 Towne Center Parkway, Hoschton, GA 30548.

25.     On October 8, 2020, I located another publicly-available website — www.releanaweightloss.com ("Releana Weightloss") — that markets hCG for weight loss.  The homepage of this website states that the program is monitored by "Dr. Arona," who I have

identified as Dr. AUDREY ARONA. The website states to contact DEBBIE RISING at 404-644-8771 or at the SUBJECT ACCOUNT, debbiekrising@gmail.com, for additional information.

26.     On October 9, 2020, I contacted DEBBIE RISING at the phone number listed at Releana Weight Loss using an undercover identity and posing as a potential customer.  In sum and substance and in pertinent part:

a.      I provided RISING the undercover name and date of birth, a Colorado shipping address, height, weight, and any known medication allergies. I was not required to fill out any forms to include a medical questionnaire.  I told RISING that I had no underlying health issues other than a desire to lose weight.

b.      RISING stated that Releana is FDA approved and is "100 percent legal". I know that this is not true.  Releana is not FDA approved.

c.      RISING stated the cost for a 30-day hCG program was $275. RISING stated that she  has no medical training and has been working for "Dr. Arona" (believed to be AUDREY ARONA) for several years. RISING told me that I would receive an email from Dr. Arona with a link to complete the purchase.

d.      I asked RISING if there are any side effects associated with hCG and RISING stated there have been a few patients that have had gallbladder issues. RISING then joked that Dr. Arona tells her patients, "I would rather be skinny with no gallbladder than fat with a gallbladder."

27.     Upon concluding the phone call, I received an email from invoicing@messaging.squareup.com that was digitally pre-associated with the name "Audrey Arona MD." I clicked the "pay invoice" button in the email completed the transaction.

28.     I then received an email from the SUBJECT ACCOUNT, associated with DEBBIE RISING.  Attached to the email was a PDF document titled "Approved Products" that contained a list of items such as deodorant, shampoo, etc. that can be used while on the hCG diet protocol.

29.     I also received another email from the SUBJECT ACCOUNT containing a PDF attachment called "Releana Patient Packet". The first page of this document had the Releana trademark at the top.  It also identified Dr. AUDREY ARONA as being associated with the business, claimed that I could lose up to 30 pounds in one month, and stated that I could call "Debbie" at 404-644-8771 or text "Dr. Arona" at 678-794-4189. In addition, this document contained detailed hCG mixing and dosing instructions, detailed a restrictive diet plan, and a maintenance phase plan.

30.     On October 14, 2020, I received the package of hCG from a FedEx store located in Littleton, CO.

a.     I opened the package and observed a document with the letterhead of "Preferred Women's Healthcare" located in Lawrenceville, GA.  The document, with a handwritten date of October 19, 2020, stated:

> I, Audrey J. Arona, M.D., acknowledge receipt of $275 (two-hundred-seventy-five dollars and 00/100) in payment of prescription medication, Releana.  This letter certifies a medical need (DX: 63.5) for [Undercover Name] in prescribing this medication aid for weight loss, lowering of cholesterol, lowering of blood pressure and stabilization of blood sugar.

After this was a handwritten signature in the name of by "Audrey J. Arona, M.D." and the DEA #BL3386542.

b.     I know, from my training and experience and the experience of others with whom I have consulted, that "DX 63.5" is a reference to the International Classification of Diseases ("ICD), which is a reference tool used to standardize medical diagnoses.  Under the ICD-10, diagnosis code 63.5 is used to describe "abnormal weight gain."  I submit that this diagnosis is fraudulent.  As set forth above, no medical exam was performed and no medical information was solicited during the conversation with RISING on October 9, 2020.

c.     I also observed inside the package a glass vial containing a white powdery substance.  One part of the label stated:

> HCG
> Human Chronic Gonadotropin
> 11,938IU
> Lyophilized

Another part of the label stated:

> Distributor Releana LLC
> 169 Towne Center Pkwy
> Hoschton, GA 30548,
> Lots#: DL4282A
> Mfg. Date 10/29/18,
> Exp Date 10/28/21.

The dosage instructions on the label stated:

> As directed by doctor
> Reconstitute with the solvent.
> Store in refrigerator after reconstitution

The words "Rx Only" were listed on the label in red letters to distinguish it from the rest of the text, which was in black.

      d.     The package also contained a dark plastic bottle containing a liquid with a label stating:

> Releana Innovations in Weight Loss
>
> Directions:  Take (0.25ml) under tongue and hold 3 minutes before swallowing. Take twice daily, 12 hours apart.  Wait 10 minutes before consuming food or liquids.

The label also identified Patent Number 7605122, stated that the volume was 15ml, and stated that each milliliter contained Sodium Bicarbonate, Ethanol, Glycerin, and Sterile Water. The label stated "For use with Releana HCG only."

     31.     Releana LLC's stated location at 169 Towne Center Parkway, Hoschton, GA 30548 is not registered with the FDA as a manufacture or distributer. Based upon statements from AUDREY ARONA and DEBBIE RISING during the phone calls referenced in this affidavit that the Releana is manufactured in Georgia, I submit there is probable cause to believe that Releana hCG is adulterated. I know, from my experience investigating purveyors of adulterated drugs, that individuals who are not licensed by the FDA to manufacture drugs often do not follow GMP (Good Manufacturing Processes) protocol when making the drug. In addition, since Releana LLC is not licensed by the FDA, its manufacturing sites are not inspected by the FDA to ensure that GMPs are being followed.

     32.     On October 14, 2020, I attempted to call DEBBIE RISING at the 404-644-8771 number, again using my undercover identity. She did not pick up, but called me back a short time later.  In sum and substance and in pertinent part:

      a.     I stated I was concerned with the medication because I thought it would have come from a pharmacy. RISING stated the medication comes from the manufacture which is Releana.   She stated "that particular Releana formula is FDA approved."

      b.     RISING further stated that Dr. AUDREY ARONA has been an OB-GYN for 20 years and has been running this program for 15 years. ARONA closed her OB-GYN practice in 2018 due to the high cost of malpractice insurance and is currently the Health Department Director of Gwinnett County. RISING stated, "Believe me when I tell you that if she runs this program, its 100 percent legit."

      c.     I told RISING  I was confused that there were two Releana websites — the My Releana website and the Releana Weightloss website— and asked which one belongs to the manufacturer. RISING stated, "If people email him about Releana, he sends them to me." She further clarified that the "him" was MAURICE BAILEY:  "Mr. Maurice Bailey is who I talk to and is who I buy directly from." RISING then stated that ARONA tells patients to be careful who you buy this from because you do not know if it comes from China.

      d.     During the call RISING referred to seeing patients who want to obtain hCG.  I asked RISING if she sees patients in person and she replied, "I see 20 patients a week

that want this." I asked if RISING if she had an office and she stated that she works out of Gynecology Association of Gwinnett, which is used by Dr. Kristine Gould. RISING then clarified she works for ARONA and that they use the Releana Weightloss website.  RISING stated, "If I don't know the answer to something, I text her or call her immediately."

      33.    On October 15, 2020, I called the 678-794-4189 number associated with Dr. AUDREY ARONA in my undercover capacity, posing as a patient.  She did not pick up, but called me back a short time later.  In sum and substance and in pertinent part:

          a.    The caller introduced herself as Dr. AUDREY ARONA.

          b.    I told ARONA that RISING had sent me some hCG and that I wanted to make sure that the oral HCG is FDA approved.  ARONA stated, "Yes, it is FDA approved and they have a patent on this as well." ARONA further stated, "I won't, you know, prescribe something that isn't FDA approved or patented."

          c.    I asked ARONA if she knows MAURICE BAILEY.  She responded, "I know him very well now." ARONA further explained that at the time BAILEY bought the patent for Releana she did not know him and was concerned.  She provided the following background context:, "I am the doctor in the country that uses and sells the most of this, um, and he knew that too." ARONA further stated, "Every time I sell it, I write a prescription for it, ok, because you can't buy it without going through a physician supposedly." ARONA stated, "I really do like Maurice, he has turned out to be a real good partner."

          d.    I asked ARONA about RISING's comment that side effects could cause the loss of a gall bladder.  ARONA acknowledged that anytime your body goes through rapid weight loss, it causes stress on your body and can bring forward underlying health issues that you were not aware of.  When I specifically asked if any of ARONA's patients on hCG have lost their gallbladder, ARONA stated, she has had a couple of patients lose their gallbladder but not so many that it could be attributed as a side effect of Releana. I asked ARONA out of how many patients total? ARONA estimated that she prescribes hCG to 100 patients a month and has had tens of thousands of patients.

          e.    I asked ARONA if she would prescribe me an amphetamine to help with my appetite.  ARONA told me she would prescribe an amphetamine if I came to Georgia. I explained that I travel to Georgia often for work and asked if I would have to see her. ARONA stated, "You see Debbie [RISING] because she works under a protocol with me." ARONA further stated that she is a health director for three counties in Georgia and right now we are "all things COVID."  I asked if I could obtain phentermine from RISING.  ARONA stated, "She [RISING] calls it in under my authority."

          f.    During the conversation with ARONA on October 15, 2020, ARONA told me that she has been selling hCG since 2008 and prescribes on average 100 times a month. CW told me during the proffer interview described above that the CW was involved in the distribution of oral hCG to others.  Documents recovered from the execution of a search warrant at the place CW manufactured hCG, I seized documents that show from 2013-2016, ARONA

purchased over $500,000 of Trileana, an oral hCG medication.  The CW told me that "Trileana" was another formulation of oral hCG designed to be different enough from Releana to avoid intellectual property issues.  While different in that respect, the Trileana sold and then distributed by AUDREY ARONA was similarly adultered and misbranded.

34.     The Drug Enforcement Administration provided me with a Prescription Drug Monitoring Report for AUDREY ARONA, who is registered with DEA license# BL3386542. From September 2017- October 2020, ARONA has prescribed Phentermine, a Schedule IV Controlled Substance, and/or Phendimetrazine, a Schedule III Controlled Substance, over 3,000 times.

### THERE IS PROBABLE CAUSE TO BELIEVE THAT THE SUBJECT EMAIL ACCOUNTS CONTAIN EVIDENCE, FRUITS AND INSTUMENTALITIES OF THE SUBJECT CRIIMES

**I.      Background:  The Internet and Email Accounts**

35.     The following definition applies to this Affidavit and **Attachments A and B** to this Affidavit.

36.     In this Affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

37.     I am familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.  Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").  An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail.  Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet.  In addition, the individual can access websites using web browsers to view or download content, or make purchases.  The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

38.     **E-mail Provider**:

a.      In my experience, I have learned that Google provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  Subscribers obtain an account by registering with Provider.  During the registration process, Provider asks subscribers to provide basic personal information.  Most public providers do not validate the information provided, however.  Nevertheless, the computers of Provider are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Provider subscribers) and information concerning subscribers and their use of Provider services, such as account access information, e-mail transaction information, and account application information.

b.      In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider.  If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers as long as the account remains active.

c.      When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Provider servers, and then transmitted to its end destination.  Provider often saves a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail, the e-mail can remain on the system indefinitely.

d.      Provider subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Provider.

39.     **Internet Service Providers ("ISPs")**:

a.      ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system and can access the Internet by using his or her account name and personal password.

b.      ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities).  These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.  ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use.  This

service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.  Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory.  Such temporary, incidental storage is defined by statute as "electronic storage," [18 U.S.C. § 2510(17)] and the provider of such a service is an "electronic communications service."  An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications [18 U.S.C. § 2510(15)].  A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service" [18 U.S.C. § 2711(2)].

      40.     **Internet Protocol Address ("IP Address")**: Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102.  Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address.  A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet.  A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records.  Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session.  Once the session ends, the IP address is available for the next dial-up customer.  On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer.  In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.  A modem is an electronic device that allows one computer to communicate with another.

      41.     A host computer is one that is attached to a dedicated network and serves many users.  These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems.  These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

      42.     Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant messages.

      43.     Further, the online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  These online storage accounts are often free but can involve a charge.  A subscriber assigned a free online storage account frequently can set up such accounts by

providing limited identifying information.  Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user.  Consequently, even if it is known that a particular user is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name.  Instead, the online service will only be able to identify files, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service.  As set forth in more detail below, there is reason to believe that the SUBJECT ACCOUNT containing evidence regarding the efforts of Dr. AUDREY ARONA and DEBBIE RISING to commit the SUBJECT OFFENSES, including by communication between one another regarding the distribution of misbranded hCG.  Such a subscriber can collect, store, view and distribute electronic files directly from the online service.  Consequently, files that may be evidence of a crime may also have minimal contact with the subscriber's home computer.  The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet.  Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service.  Evidence of an online storage account may take the form of passwords located in encrypted, archived[1], or other files on the user's home computer.  Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service.  This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

## II.     DEBBIE RISINGS's Use of the SUBJECT ACCOUNT to facilitate the sale of misbranded hCG Medication

44.     On October 16, 2020, I served a 2703(d) court order to Google for subscriber and IP address records for the drarona@aol.com.

45.     On October 18, 2020, I served a request to Google to preserve the SUBJECT ACCOUNT pursuant to 18 U.S.C. § 2703(f).

46.     On October 19, 2020, I received records from a 2703(d) court order to AT&T requesting tolls and subscriber information for the phone used by Dr. AUDREY ARONA (678-794-4189). The subscriber of the phone number is "Gwinnett County Board of Health FN" with a user name of "Dr. Arona." I found no toll contact between this number and the number used by DEBBIE RISING (404-644-8711).  During undercover conversations with RISING, RISING stated that the x8711 number was her "work cell phone" thus implying she might have a personal cell phone.  I queried a law enforcement database and found another possible cell phone for RISING, 770-262-6576.  I then searched the toll records received for ARONA's phone number, ending x4189, for contacts with the cell phone suspected of being subscribed to by RISING, the x6576 number. The result of the query showed approximately 380 contacts between the two numbers from October 15, 2018 and March 13, 2020. I submit that that these contacts establish probable cause to believe that ARONA works closing with RISING to operate a business that distributes misbranded hCG in interstate commerce.

---

[1] Archive files are files which generally contain other files in a compressed format.  Thus, Archive files may be thought of as containers containing other files.  Archive files are commonly referred to as "zip" or "zipped" files.

47. Records received from Oath Inc. on October 19, 2020 show that the account of drarona@aol.com was created on December 3, 1999, under subscriber name of "Audrey Arona" with a date of birth of 5/1/1958, and a contact phone number of 678-794-4189.

48. A review of the email header document provided by Oath Inc. for the draron@aol.com account between October 10, 2018- October 15/2020, showed 15 emails to/from the SUBJECT ACCOUNT.

49. As stated in paragraph 27, I received an email from the SUBJECT ACCOUNT containing an "Approved Products" PDF document and "Releana Patient Packet" PDF document upon the completion of the undercover purchase of hCG.

50. As set forth above in paragraph 25 the Releana Weightloss website directs those seeking hCG to contact the SUBJECT ACCOUNT for more information. Furthermore, as set forth above in paragraph 27 and elsewhere, my experience in obtaining the hCG through the website leads me to believe that the SUBJECT ACCOUNT is used to send information to everyone who purchases the drug from RISING and ARONA. During the phone call on October 14, 2020, RISING stated that she sends out 5-10 packages of hCG on average every week, on top of seeing approximately 20 patients per week for hCG in Georgia. Finally, during the conversation with RISING on October 14, 2020 I asked RISING whether the hCG was made in the United States. RISING stated that she was not sure but that she would get me an answer, and stated she would email MAURICE BAILEY. I submit this provides additional probable cause to believe that RISING uses the SUBJECT ACCOUNT to facilitate a business that sells and distributes misbranded and adulterated drugs through false and fraudulent statements, representations and promises.

## AUTHORIZATION REQUESTS

51. I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

52. This application seeks warrants to search all responsive records and information under the control of Google, providers subject to the jurisdiction of this Court, regardless of where Google and Microsoft have chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google possession, custody, or control, regardless of whether such communication, record, or other information is stored, held,

or maintained outside the United States. [2]

## REQUEST FOR NON-DISCLOSURE, TO RESTRICT CASE AND TO KEEP ACCOUNT ACTIVE

53.     Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I respectfully request the Court order Google not to notify any other person, including the holder of the SUBJECT ACCOUNT identified in Attachment A, of the existence of this warrant.  This request is made because notification of the existence of the warrant may result in flight from prosecution, and/or witness and evidence tampering.  Specifically, in this case the subjects of the investigation are frequent international travelers with extensive international contacts who, if alerted, would have the means and abilities to evade the jurisdiction of United States law enforcement.  In addition, alerting the subjects of this investigation might cause them to delete information on telephones or information in email accounts and on computers that are not yet known to law enforcement.  It might also cause the subjects to ship illegally hunted trophies and other evidence to jurisdictions outside the reach of United States law enforcement or to destroy that evidence.

54.     Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the account further detailed in Attachment A, in an open and active status.

55.     I respectfully request that this affidavit and the Court's Order be RESTRICTED at level 3 until further order of this Court.

56.     Google is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2).  This warrant application is sought pursuant to 18 U.S.C. § 2703, and seeks to require Google to disclose certain records and information to the United States.  This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order."

57.     The restriction is necessary because this affidavit reveals an ongoing investigation.  For the same reasons described in paragraph 49 above, restriction will avoid premature disclosure of the investigation, guard against the flight of investigative subjects, and

---

[2] It is possible that Oath Inc. stores some portion of the information sought outside of the United States. In *Microsoft Corp. v. United States*, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Google. The government also seeks the disclosure of the physical location or locations where the information is stored.

efforts to tamper with or destroy evidence, except that copies of the affidavit in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the FDA-OCI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

## CONCLUSION

58.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

59.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

60.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES may be located within the SUBJECT ACCOUNT respectively described in **Attachments A and B**.

61.     I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in **Attachments A and B**.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*/s Christopher Gann_____*
Special Agent Christopher Eric Gann
FDA-OCI

SUBSCRIBED and SWORN before me this 2nd day of November, 2020

_____
HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Bryan David Fields, Assistant United States Attorney.

17

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The account and information associated with debbiekrising@gmail.com (hereinafter and in Attachment B "SUBJECT ACCOUNT") that is in the possession of Google LLC (hereinafter and in Attachment B, "PROVIDER"), whose office is located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, more fully described in Attachment A, attached hereto

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Pursuant to 18 U.S.C. § 2703, PROVIDER as described in Attachment A is hereby ordered as follows:

### I.      SEARCH PROCEDURE

a.      The search warrant will be presented to personnel of the PROVIDER, who will be directed to isolate those accounts and files described in Section II below regardless of whether such information is stored, held or maintained inside or outside of the United States;

b.      In order to minimize any disruption of computer service to innocent third parties, the PROVIDER'S employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

c.      The PROVIDER'S employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

d.      Law enforcement personnel will thereafter review all information and records received from the PROVIDER'S employees to determine the information to be seized by law enforcement personnel specified in Section III.

### II.      FILES AND ACCOUNTS TO BE DISCLOSED BY THE PROVIDER'S EMPLOYEES

a.      For the SUBJECT ACCOUNT listed in Attachment A **for the time period from January 1, 2016 to present** the PROVIDER shall disclose the following information regardless of whether it is held inside or outside the United States, and the disclosure shall include all information even if deleted yet still available to the PROVIDER, and all information preserved pursuant to a request under 18 U.S.C. § 2703(f):

1.      The contents of all communications, including e-mails and attachments, google voice communications, and text communications (including SMS and MMS), associated with the SUBJECT ACCOUNT, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) e-mails sent to and from the account, draft e-mails, existing printouts of any such e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

2.      All records and information regarding locations where the account was accessed or used, including all data stored in connection with Location Services;

3.      All records pertaining to communications between the PROVIDER and any person regarding the account, including contacts with support services and records of actions taken; and

4.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to the provider (including, but not limited to, the keybag.txt and fileinfolist.txt files).

5.      All records or other information regarding the identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses, phone numbers, or other identifying information provided during registration, other associated e-mail and other online accounts, all screen names associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

6.      The services the SUBJECT ACCOUNT utilized and all records generated by those services;

7.      All records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, and files;

8.      All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

9.      For all information responsive to this warrant, regardless of whether such information is stored, held or maintained inside or outside of the United States, the physical location or locations where the information is stored.

b.   The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

### III.   INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

All information described above in Section I that constitutes evidence and/or instrumentalities of crimes involving violations of federal laws relating to fraud and the FDCA, including  misbranding and/or adulteration (18 U.S.C §§ 331 and 333), mail fraud, (18 U.S.C. §§ 1341), wire fraud (18 U.S.C. § 1343) and distributing controlled substances (21 U.S.C. § 841 (a)(1) and (c)), (hereinafter the "**SUBJECT OFFENSES**,") including the contents of communications, associated with SUBJECT ACCOUNT since **January 1, 2016**, including, for

each account or identifier listed on Attachment A, information pertaining to the following matters:

1.      Records and information, electronic mail, attachments, and related computer files that identify the account user, individuals, or correspondents, or that identifies the means or methods used to commit the SUBJECT OFFENSES;

2.      Records and information, electronic mail, attachments, and related computer files that evidences or identifies means of payment relating to the SUBJECT OFFENSES;

3.      "Address books" or other lists of correspondents that identifies individuals or correspondents involved in the SUBJECT OFFENSES;

4.      Saved "chats" or other communications that relate to the SUBJECT OFFENSES or that identify individuals involved in the SUBJECT OFFENSES;

5.      Records, information, documents, visual depictions, and materials pertaining to the SUBJECT OFFENSES;

6.      Records, information, notes, documents, records, or correspondence, in any form and medium pertaining to the SUBJECT OFENSES, or that may be helpful in identifying any such offenses;

7.      Records and information, notes, documents, records, or correspondence, in any form and medium between and among AUDREY ARONA, DEBBIE RISING, MAURICE BAILEY and others that relate to the SUBJECT OFFENSES;

8.      Records and information relating to the state of mind of the user of the SUBJECT ACCOUNT and others in communication with that account in relation to the SUBJECT OFFENSES;

9.      Records and information, notes, documents, records, or correspondence, in any form and medium from, relating to the manufacturing and distribution of hCG and distribution of amphetamines pertaining to the SUBJECT OFFENSES;

10.      Records and information relating to financial transactions completed over Square or comparable financial services;

11.      Images, correspondence, and other records that help identify the users of the SUBJECT ACCOUNT;

12.      Location information associated with the SUBJECT ACCOUNT that may help show where and who is involved in the SUBJECT OFFENSE;

13.      Information about the devices used to access the SUBJECT ACCOUNT that is evidence of or identifies persons involved in the SUBJECT OFFENSES;

14.     Records relating to who created, used, or communicated with the SUBJECT ACCOUNTS or identifiers, including records about their identities and whereabouts.

## IV.     ORDER OF NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

a.      Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders PROVIDER not to disclose the existence of this search warrant to any person, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

b.      The Court further orders PROVIDER to continue to maintain the SUBJECT ACCOUNT in an open and active status so as not to disrupt this ongoing investigation.

## V.     PROVIDER PROCEDURES

a.  The PROVIDER shall deliver the information set forth above within 14 days of the service of this warrant and the PROVIDER shall send the information to:

Special Agent Christopher Gann
25587 Conifer Rd.
Suite 105-506
Conifer, Colorado 80433
Phone: (832) 540-6688
Email: Christopher.gann@fda.hhs.gov

b.  Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

## VI.     DEFINITIONS

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).